on behalf of Alex Tejeda. I'll do my best to watch my own clock and I'll try to reserve about three minutes for rebuttal. We've raised a number of claims on Mr. Tejeda's behalf and I'm going to try with the time I have to get through as many as I can down the line through our brief. The first issue is the claim of evidentiary error. And on these issues, the parties dispute both the standard of review and the merits. And with the court's permission, I would prefer to dive straight into the merits based, frankly, on our view that Mr. Tejeda should get relief under either standard of review. To begin, the government has conceded that Sergeant Carson testified in nonresponsive and narrative fashion. And so I would ask the court to find those errors uncontested and established. They're also important errors because they struck at the heart of intent. And in particular, that in one of his narrative nonresponsive answers is when Sergeant Carson testified on the ultimate issue in the case, which is when he said at ER 435 that it appeared that Mr. Tejeda was distributing ounces of drugs. Now, moving on to the dual role issue more specifically, really the only dispute between the parties is whether or not this testimony constituted lay opinion under 701 or expert opinion under 702. And we've asked the court to rule in our favor on two bases. Number one is judicial estoppel on the ground that the government conceded below when it was arguing about Detective Doar that drug trafficking modus operandi evidence has long been expert testimony. Number two is that based on that same case law for decades, this court has held that modus operandi testimony in a drug case is expert testimony. And so one thing I'm wondering about is if it was expert testimony, these people were never qualified as experts. True. Three of the four, Your Honor. I'm sorry, what? Three of the four. Right. So why are you arguing about dual role instead of the fact that they simply weren't qualified as experts? Well, what they ended up doing was testifying as hybrids because three of them were investigating. Well, I understand that, but before somebody can qualify as an expert, the judge has to qualify them as experts, and that never happened. At least for two of them, Your Honor, and I'm thinking of Smith and Carson. There's a good chance that they would have qualified as experts anyway. I'm less certain from the record about the other officer, but there's a good chance that they would have qualified as experts anyway, so I'm not sure. But what we do have. They would have, but they didn't. But they didn't. That's true. They wouldn't. Weren't qualified as experts. I'm sorry? Maybe they could have if they had been put to it, but the judge never did say that they were qualified experts. They wouldn't. Maybe in the future I would raise that claim, Your Honor. But in this case, what they did do was. . . That's how I've always seen it raised before. I thought this was odd. And my recollection, Your Honor, is I've seen it denied on the basis that they would have qualified as experts anyway, so it's harmless. But in this case, what happened was they ended up testifying in a dual role capacity, hybrid fact and expert, without any cautionary instructions guiding the jury about how to handle that. And we know that that's plain error from the Vera case and from Toralba Mendia, and so we asked the court to find a pretty straightforward plain error on that issue. Well, but in order to find plain error, we have to find prejudice, and you did have an expert who was qualified as an expert and who testified to basically the same thing. That's true, Your Honor. And on that issue, I would refer you to the Vera case again, and the Vera case speaks to that issue. So there would be potentially a temptation to sweep these errors under the rug and say, oh, it's cumulative, they already heard it, don't worry about it. But actually what the Vera case teaches us, and I'm going to try to find the site if I can, is that the opposite is true, that the repetition itself runs the risk of usurping the jury's function. Well, of course that can be true in the abstract. I'm not sure it's true here. It is true here, Your Honor. Because it seems to me that the evidence, independent of what they said, the statements you're challenging, the evidence was really strong. Well, what the evidence, the Judge Trott, and I believe it was the Toralba case, forgive me if I got the case wrong, cautioned against that. We have all been participating in the criminal justice system for a long time, and we've seen many of these cases, and we know that maybe carbon paper means drug trafficking or certain quantities mean drug trafficking, and these things indicate drug trafficking. But the case law cautions us against jumping into the shoes of the jurors with that mindset and instead to put ourselves in the shoes of a layperson that is receiving testimony within the confines of an American courtroom, and one duly qualified expert said, yeah, these patterns indicate to me drug trafficking. But then what the jury heard, and there were reasons not to believe him. He had no involvement in the case, and he just reviewed a few reports, and he got on the stand, and he riffed off about this, that, and the other thing. And he had a really testy exchange with defense counsel, and maybe the jurors would have disliked him. We don't know. But then three other investigating officers, including the sergeant, who was involved with the cooperating witness, took the stand, and they corroborated him, and they said the same thing. So over and over and over again throughout this trial it was saturated with this idea of this evidence indicates drug trafficking. It indicates drug trafficking. It indicates drug trafficking. So they heard it from four officers, and we know from the case law and from common sense that officers are, they take the witness stand with the imprimatur of reliability and believability, and jurors are inclined to trust law enforcement officers. And so at a bare minimum I would ask jurors to take this issue into consideration as part of a cumulative error analysis. Moving on, if I could, to the second issue, which is a special verdict for him. Here again, to the government's credit, it has conceded the error regarding mens rea. And so if I could also move on then to the instructional errors, which we framed in two ways, and with the time I have I'd like to focus, if I could, on specific unanimity. I think this case presents a pretty straightforward application of the Lapeer case. Both cases involve genuine possibility of doubt about which co-conspirators the jurors could have found. Let me go back to the other issue. The co-conspirators thing doesn't make any sense to me because there were no other co-conspirators ever mentioned and nobody else was on trial. I mean, you're just sort of making up that they could have thought there was some other conspiracy. But no one ever brought up any other conspiracy or any other person. Your Honor, I was actually trying to speak more to the specific unanimity. But to go to the other issue, the jury instruction question. Right. So if the jury instruction – if we view the special verdict form as essentially supervening what was a correct instruction, the instruction was correct, the special verdict form was wrong, right? Well, I have to think back about what the instruction said about quantity. I'm sorry, what? I have to think back about what the instruction specifically said about quantity. I don't remember the instruction saying anything about knowing possession. I could be wrong about that, Your Honor, so please don't. Well, my understanding is that was so. But even so, if we regard this verdict form as sufficiently – more likely to be regarded because it's what was directly in front of them. Yes. We still have a – was there an objection to this? No. Plain error. So we're back to the plain error. So the question is what's the prejudice? How does the prejudice run? The prejudice – the main argument that we've raised in our brief, Your Honor, is that there's actually a pretty straightforward way that the jurors could have erroneously found reasonable foreseeability. Now, this was about count two, and count two focused on the apprehension and the Malibu car contraband. And what we have was the officers chasing Mr. Tejada on foot and claiming that they saw him throwing smaller quantities of drugs off of his person, which they then recovered and composed for a photograph, and they took that and showed that to the jury. That would have been a certainly plausible basis for the jury to find guilt on that count. But what defense counsel was contesting at trial was knowing possession with intent to distribute of all the drugs, in particular in the car. And there was a large quantity of drugs in the wheel well underneath it and hidden from view except for a teeny little part of a plastic bag poking out. And that, to me, screams out for reasonable foreseeability because if the jury – if any of the jurors maybe had a reasonable doubt about whether or not those drugs, which are different in terms of – And I just help you argument along. This was not his car. It was not registered to him, no. That's right. And there was ambiguity from Ms. Johnson's testimony about how often he drove it and how familiar she really was with it, and she misidentified a different car as his. So there's some uncertainty about how often he was in that car, and that's clear from the trial record. The jury did find on one count less drugs than was charged. Conspiracy count, yes. And not this one. Not count two. Correct. And that's the prejudice, Your Honor, because they could have found that the drugs in the trunk in the wheel well that were just poking out barely were reasonably foreseeable. Even if he didn't know they were there, they could have fallen back on the safety net of saying, well, at least it was reasonably foreseeable. And so that is the prejudice, Your Honor, with respect to the verdict form. Do you know whether in this case the judge sent in the written instructions to the jury room? I believe so, Your Honor, but not the indictment. So they had the instruction in front of them as well as the verdict form, right? Right. And then when they checked the box on the verdict form, that's the one that was actually saying reasonably foreseeable. So if I was a juror reading that, I would say, oh, the judge says I can find reasonable foreseeability, even if it didn't say it on the jury instructions because that's the box they're checking. If I could return, Your Honor, to specific unanimity, I do believe that we're close to all-in-all-fours with the Lapierre case. And it's kind of a two-pronged analysis, so I'm going to try to speed through it. Number one is the jury could have, and I believe the evidence reflects, did have doubts about Ms. Johnson. And the jury instructions told the jurors to be skeptical of her as a cooperator. She told them she was trying to work off a 14-year sentence. She pretty obviously lied about not having any idea there was a pound of methamphetamine covered in dust in her own closet. And so I think it's quite reasonable for a juror, one or more jurors in this case, to have said, to have thought to themselves, you know what, I just don't really like her, I don't trust her, I think she lied to us, and I don't want to be involved in the deprivation of a man's liberty based on what she said. But on the other hand, it's also quite plausible that they weren't particularly impressed with Mr. Tejada. He was, as Judge Berzon, you noted, or to your Honor, Judge Fletcher, he was found in close proximity to a large amount of contraband. And so from a juror's perspective, they could have faced this situation and said, look, don't like Johnson, don't particularly like Tejada, what to do? There was evidence in the trial record that Mr. Tejada was involved with other people in drug distribution. It wasn't as strong, potentially, as with Johnson because nobody else took the stand, but. Any case where this problem has ever been raised without co-defendants, actual or named people who could have been the other conspirators? Not named people. Lapierre involved named people, yes. But if you look at the conspiracy instruction, Your Honor, it didn't require any named people. It just said two or more people. So it was really open-ended. And so a juror who disliked Johnson and disliked Mr. Tejada could have said, well, he had a bunch of drugs in the car. He didn't give them to Johnson, so he's doing it with somebody else. The car was registered to somebody else, as Judge Fletcher, you pointed out. And there was text message evidence indicating that he was going to get heroin from somebody else if a juror believed that that text message was actually sent by Mr. Tejada. So there is evidence of Mr. Tejada in this record conspiring with somebody else besides Johnson. And so a juror who disliked Johnson and disliked Tejada could have found that he conspired with somebody else. And that would have been entirely permissible under the conspiracy instruction, which didn't cabin their discretion in any way to a specific person named in the indictment, which would have been Ms. Johnson. And I guess with that, unless there's another question I can answer for Your Honor, I'd like to reserve the rest of my time. You've saved a little time. Thank you. Good morning, Your Honor. My name is Steve Corso. I represent the United States this morning. May it please the Court. We asked the Court this morning to affirm Mr. Tejada's convictions as well as sentences. We've listened to the argument. You've read our briefs. We're very comfortable in this case that – You're asking to affirm even as to count to? Correct. Even though the verdict form is clearly wrong? Yes, Your Honor. Because? Well, as we wrote in our brief, we agree essentially that there was a defect in the verdict form. But given the overwhelming weight of evidence in the case, we don't feel that the defect affected Mr. Tejada's substantial rights. This has to be asked to the amount on that particular account. So on that particular account as to amount, what is the overwhelming evidence? The overwhelming evidence is the approximately 56 grams of methamphetamine in the trunk of the defendant's mouth. So you need the drugs in the trunk? We absolutely need the drugs in the trunk. If I'm a juror and I get that he's running away, I get that he's throwing drugs off his purse, and those seem to be pretty clearly connected to him, but he has at least a decent argument. I didn't know about those drugs in the trunk. This is not my car. They're not visible. They're not very visible. Why is it not plausible that a juror would have thought, well, you know, I can just say reasonably foreseeable. That's an easy way to get at that one. Your point's well taken, Your Honor, but we disagree. The overwhelming evidence in this case is that the defendant, Mr. Tejeda, was heavily involved in drug trafficking. He was at the scene of Ms. Johnson's apartment minutes before the sale to the CI. He was accused by Ms. Johnson of Ms. Johnson told the officers that Mr. Tejeda would be returning to her apartment with drugs. Ms. Johnson told the officers that Mr. Tejeda supplied her with drugs. But the jury did, in fact, find with respect to another count that the amount of drugs that you alleged was not, did not agree with the amount that you alleged, right? That's correct, Your Honor, and we actually believe that that supports our position in this case. Therefore, they were looking carefully at the fact that he was a drug dealer in the vicinity of a lot of drugs did not persuade them that he was responsible for any drugs that were anywhere in the vicinity. That's correct. We made that point in our brief, and we can reiterate this point. Therefore, with respect to these drugs, had they not been told the reasonably foreseeable erroneous instruction, they might have considered, as they did on the other count carefully, whether those particular drugs were attributable to him. Well, to us, it looks like the jury, when it could have very easily applied a reasonable foreseeability standard to the drugs, the near pound of methamphetamine in Ms. Johnson's apartment, certainly given all the evidence that Mr. Tejeda and Ms. Johnson were conspiring to distribute drugs together, it would certainly be arguably reasonably foreseeable that Ms. Johnson would have a pound of methamphetamine near the attic in her bedroom and that Mr. Tejeda would be criminally liable for that. But the jury didn't do that, which indicates the jury was very precise in its findings. Exactly. And therefore, they precisely considered what they were told in this instance, which is they didn't have to find actual knowledge. Well, there's a lot of evidence in the record where Mr. Tejeda did knowingly possess the drugs in the trunk. So in addition to all of his scene at Ms. Johnson's apartment near the time of the sale, the tip from the officers that he would be returning the drugs, the text messages between Ms. Johnson and Ms. Tejeda, where Mr. Tejeda is quite clearly a business partner of Ms. Johnson's, he quite clearly supplies her with drugs, and he's quite clearly Tejeda had a non-frivolous argument that he did not know. I assume this is correct that you, the government, prepared this verdict for him? The government did prepare the verdict for him, yes. You know, sorry. Well, we're not arguing that the verdict for him was correct. Right out of the shoot here, we said there was a defect in the verdict for him. It did expand the mens rea from knowing possession to reasonably foreseeable possession. Right. But you don't like to live with the consequence. Well, I'm living with the consequences right now. You're trying to avoid the consequence. Well, we're not. We want to take this head on. What about the other issue, the first issue, with regard to the lay testimony? This seems to have been inappropriate lay testimony. Do you agree? We do not agree. Why not? We feel— How could it be both the same exact testimony, essentially, as was given by the person you qualified as an expert, was given by three people who weren't—or two people who weren't qualified as experts, and it either is or isn't expert testimony, and it appears that it is. Right. We understand kind of the logical defect of the position we find ourselves in this case, and I think Your Honor is correct in identifying it. Were you the trial lawyer? I was not. Nobody else in your office? Yes, somebody who's no longer with the office. So, therefore, it seems to me you have a hard time saying that this testimony, which you got in as expert testimony and, therefore, opinions that you couldn't have otherwise gotten in, presumably, could then also come in as lay testimony. Well, you know, this is the challenge before the Court, I think, in this case, on this issue in particular. As we pointed out in our brief, it's a very thin line, I think, on many occasions. Well, how can it be lay testimony when somebody—it's not his—it's specifically not his perceptions. He's sitting up there and he's saying, because of things that happened in other cases and because of things I learned in my training and so on, I understand what this is, which I wouldn't just from my own perception. Isn't that what he's saying? To an extent. We agree with the Court that there is some degree of specialized knowledge that was present in the lay opinion testimony by the officers, that there definitely is. But under Von Wille, as we read Von Wille and understand it, Von Wille gives the officers just a small amount of space to rely on their training and experience to testify on their direct perceptions, which incorporates their prior training and experience, and they can tell the jury that I saw this item and I think it indicates drug trafficking. It's a small window, and this is the line that separates, I think, expert opinion under 702 from lay opinion under 701. But under Von Wille, what the trial attorney did in this case is acceptable. And I would like to point out—we didn't point it out in our brief, but I would like to point it out today— that in the trial brief filed a few weeks before the trial, the trial lawyer in our office did notify the Court and the defendant of his intention of having the officers give lay opinion testimony, in addition to the expert opinion that would come from Detective Doar, who testified later. So what? I mean, it still either was proper or not proper. I'm sorry? So what? It was either proper or not proper nonetheless. I'm not understanding your question. The fact that he notified the Court doesn't make it right. Well, it doesn't make it right, but it does put the defendant on notice that it's coming. It also put the judge on notice that it was coming. And the trial attorney did cite the Von Wille case, which we believe justifies what the trial attorney did at trial. So if we disagreed with that and thought that this was inappropriate lay opinion testimony, then what? I think we go down to plain error. We go to a plain error analysis, and we look at whether the admission of this lay opinion testimony, which you would deem improperly admitted, would affect the defendant's substantial rights. Did it affect the outcome of the case? And given the overwhelming strength of the evidence, given all the evidence in multiple locations in this case that the defendant, Mr. Tejeda, knowingly possessed narcotics with the intent to distribute them and conspired with Ms. Johnson to possess them with the intent to distribute, the case doesn't survive plain error, and the decision goes to the government, and the conviction should be affirmed. I'd like to go back. Before we leave this topic, there was a point I wanted to make. I was trying to make and trying to get to the issue of specific unanimity and the knowledge. Mr. Tejeda, we believe the evidence suggests that Mr. Tejeda knew the drugs were in the trunk, and this argument about the corner of the Ziploc baggie peeking out from under the wheel well is not persuasive. When Mr. Tejeda was stopped, he ran, as the courts acknowledged. He was caught. He threw down drugs as he ran, and he was eventually caught with more drugs in his possession at Bookin. So given all that, given all the possession of drugs that is attributed to him, it's far-fetched to begin to argue that he didn't know about the drugs in the trunk of the wheel well. To move on and continue on that point, when they caught Mr. Tejeda, he immediately began disavowing or kind of disconnecting himself from the Malibu, and our position is this was a consciousness of guilt, and he tried to distance himself from the Malibu, we believe, because he knew. Distance himself from what? Distance himself from the Malibu. As the court noted earlier, the car was not registered to Mr. Tejeda, so technically it was not his car, but Ms. Johnson told the officers that it was Mr. Tejeda's car, that he drove it often, that she saw him drive it often, that he would be returning to her apartment in that car, the gold Malibu, with drugs to give to her to sell. And lo and behold, there were drugs in the car. They were hidden. Was it his car, or she said he was in the car? No, it's not registered. The car's not registered to him, so technically it's not his car. You said that she said it was his car, or she said he's in the car and he's going to come back? In her mind, it's effectively her car, his car, because he drives it a lot and she sees him drive it a lot. And she said it's his car? Yes. She did? Yes. I thought she said he's going to come back in the car, but I don't know. I think she goes further than that. I think she communicates to the officers that the car is his, irrespective of the small detail of whether it's registered to him or not. I don't quite remember it that way. Do you have the transcript where she says that? I do not have it with me. But my impression from reading the transcript is that she communicated to the officers that that's the car he drove. It's one of two cars he drove, a gold Malibu and then a second car. This may be just cutting it too fine. The car he drove doesn't necessarily mean his car, although those words slip around in ordinary talk. That's how we see it. It's ordinary communication, not precise, not Ninth Circuit communication. We don't expect Mr. Johnson to be talking a legal title necessarily. Correct, yes. So kind of finally, just to wrap this point up, the defendant, when he was caught, immediately began disconnecting himself from the Malibu. And we believe that he did that because he knew there were drugs tucked away in the spare tire well. That's a pretty good argument. I wish you'd had the right words in the verdict form. You're right. The verdict form is what it is. There's nothing we can really say directly on that point. But again, he said, I borrowed the car. The car belongs to somebody else. I don't know who it belongs to. And in our minds, he knew the drugs were in the car because of that. And the jury, therefore, had a lot of proof, a lot of evidence in the record, with which to correctly find him guilty of knowing possession and correctly determine that he knowingly possessed more than 50 grams of methamphetamine, which, as we mentioned, we need the trunk drugs to get to the 50-gram threshold. All right. My time is running low. If there are no other questions, then I'll be happy to sit down and yield the rest of my time to the court. Okay. Thank you. Thank you, Your Honor. If I could make a couple of points, please, Your Honors. Number one, as to Johnson's alleged certainty about the car, I refer Your Honors back to footnote 7 of our opening brief. We've cited ER 268 to 269. After she got arrested, she misidentified a car as Mr. Tejeda's. She identified a Ford Taurus, and it was actually Officer Adair who corrected her based on what he remembered seeing during the surveillance. So the notion that Ms. Johnson was super intimately familiar with this car and she knew that it was Mr. Tejeda's and all that, it's just not supported by the record. Number two, I need to contest counsel's request for plain error review on our evidentiary errors for two reasons. Number one, it completely ignores the motion in limine procedure. The whole point of in limine is to set the goalposts so everybody knows what evidence is admissible and inadmissible, and Mr. Tejeda moved to exclude this evidence. He anticipated dual-role testimony. He asked to exclude it. The judge said, yeah, I don't like it either, and the government promised not to do it. And then the government did it three times with three different officers. So to say that it's unpreserved is untrue. It's also preserved under Freeman, Kevin Freeman. In the Kevin Freeman case, this court held that— Your argument depends upon two pieces, the first of which is that, although this purported to be lay testimony, it was actually expert testimony. And was there any preservation of that issue? Well, he specifically asked to have none of this hybrid dual-role testimony, and the government promised not to do it, and the district court disapproved it. And they purported not to do it because they purported that this was not— and they are still arguing that it wasn't expert testimony. Therefore, it wouldn't have been hybrid testimony. But it was hybrid testimony. It was unauthorized and unqualified hybrid testimony, but that's exactly what it was under a straightforward— I understand that, but that complicates your preservation point. Because they weren't technically qualified? They were told to judge that this is actually expert testimony. That gets me back to Kevin Freeman, Your Honor. The Kevin Freeman case, this court refused to apply plain-error review because the defense lawyer made foundation speculation arguments, which basically made the essence of the dual-role test. So without using the word dual-role or hybrid, the Kevin Freeman case supports our position that these speculation and foundation objections that were made contemporaneously and were repeatedly denied, thus making any more of them futile by Judge Burgess, preserved that issue. And so I would ask the court now to apply plain-error review. Okay. Thank you, Your Honors. Okay, thank both sides. United States v. Tejeda, submitted for decision.
judges: Tashima, W. Fletcher, Berzon